IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COLONY INSURANCE COMPANY | : | NO.  21-0289 |

## <u>**MEMORANDUM**</u>

ELIZABETH T. HEY, U.S.M.J.                                    January 31, 2022

In this diversity action, Plaintiff, Cincinnati Insurance Company ("Plaintiff" or

"Cincinnati"), seeks a judicial determination that Defendant, Colony Insurance Company

("Defendant" or "Colony"), is obligated to defend and indemnify Cincinnati's named

insured, Lobar, Inc., in connection with an underlying personal injury suit.[1]  Specifically,

Cincinnati asserts that Lobar qualifies as an "additional insured" under a commercial

general liability insurance policy issued by Colony to Architectural Steel & Associated

Products, Inc. ("Architectural Steel").  Presently before the court are the parties' cross-

motions for summary judgment.  For the reasons that follow, Plaintiff's motion will be

denied and Defendant's motion will be granted, and I will enter judgment in favor of

Defendant.

---

[1] The underlying personal injury suit is currently pending in the Court of Common
Pleas of Montgomery County, Pennsylvania.  See <u>Sokoloff v. Lobar, Inc. v. Architectural
Steel & Assoc'd Prods., Inc.</u>, No. 2017-20647 (Mont. C.C.P.) (the "Underlying Action").
The complaint filed in the Underlying Action is attached to Defendant's summary
judgment motion at Doc. 34-5 ("Underlying Complaint").

I.    **FACTUAL AND PROCEDURAL BACKGROUND**[2]

A.    **The Underlying Action**

In the Underlying Action commenced on February 21, 2017, the plaintiff, Robert Sokoloff, alleges that on February 23, 2015, he slipped and fell on accumulated ice at a construction site located at Hatfield Elementary School in Hatfield, Pennsylvania (the "Site").  See Underlying Complaint at 1 & ¶¶ 4, 7.[3]  At the time of the incident, Mr. Sokoloff was working at the Site, id. ¶ 7, and was an employee of Miracle Steel, Inc. Doc. 35 ¶ 15; Doc. 37-1 ¶ 15.[4]

Mr. Sokoloff's complaint further alleges that Lobar (Cincinnati's named insured) "was the general contractor and/or construction manager responsible for the safety of the workers on [the Site], including [Mr. Sokoloff]."  Underlying Complaint ¶¶ 4, 5.  Mr. Sokoloff specifically alleges that Lobar was negligent in failing to properly maintain the Site to prevent a dangerous, slippery, unsafe, and/or hazardous condition to exist, that

---

[2]Except where noted, the facts and procedural history are not in dispute. Therefore, the factual and procedural background will generally omit citations to the statement of undisputed facts accompanying the cross-motions for summary judgment. See Plaintiff's Statement of Undisputed Facts (Doc. 35) and Defendant's Statement of Undisputed Facts (Doc. Doc. 34-2).

[3]Pinpoint citations to exhibits with numbered paragraphs will be to those numbered paragraphs, and citations to deposition transcripts will be to the transcript pages.  Other pinpoint citations will be to the court's ECF pagination.

[4]Plaintiff avers that Architectural Steel retained Miracle Steel to perform certain iron/steel work at the Site.  Doc. 35 ¶ 15.  Defendant denies the averment, noting that the record citation provided by Plaintiff does not mention Miracle Steel, its relationship to Architectural Steel, or Mr. Sokoloff's employment status.  Doc. 27-1 ¶ 15. The relationship between Architectural Steel and Miracle Steel is not relevant for purposes of the present dispute, and therefore to the extent the relationship is disputed, I need not resolve the dispute.

Lobar had actual notice of the accumulation of ice, and that the accumulated ice caused

Mr. Sokoloff to slip and fall, causing various injuries.  Id. ¶¶ 7, 9-15.

As will be explained, Architectural Steel (Colony's insured) was a subcontractor

to Lobar at the Site.  Mr. Sokoloff did not name Architectural Steel as a defendant in the

Underlying Action, nor does the Underlying Complaint allege that Architectural Steel

caused Mr. Sokoloff's injuries or mention Architectural Steel at all.  See Underlying

Complaint.[5]  In response to the Underlying Complaint, Lobar filed a joinder complaint

naming Architectural Steel as an additional defendant and alleging that Architectural

Steel's negligence caused Mr. Sokoloff's injuries.  Sokoloff v. Lobar, Inc. v.

Architectural Steel & Assoc'd Prods., Inc., No. 2017-20647, Joinder Complaint (Mont.

C.C.P.) (Doc. 35-2), at 9-12 & ¶ 6.  Mr. Sokoloff opposed Lobar's motion to add

Architectural Steel as an additional defendant, arguing that the motion was filed out of

time and that he would be prejudiced by the joinder.  Id., Sokoloff's Reply in Opposition

to Lobar's Motion to Join Architectural Steel as an Additional Defendant (Doc. 34-7), at

5, 6.[6]

---

[5]In its motion for summary judgment, Plaintiff inaccurately asserts that the Underlying Complaint alleges that "Architectural Steel breached its duty to both Mr. Sokoloff and Lobar Inc. by failing to perform its contractual services at the Project Site at the time relevant to Mr. Sokoloff's fall," Doc. 35 at 15, citing the Underlying Complaint ¶ 5.  The Underlying Complaint contains no such language, explicitly or by implication, and instead asserts a single negligence claim only against Lobar.

[6]It appears that any direct action by Mr. Sokoloff would have been time-barred at that point, as the Underlying Action was filed just two days before the expiration of Pennsylvania's two-year statute of limitations for personal injury actions.  See 42 Pa. C.S.A. § 5524.  While the date of the Joinder Complaint is not clear on the present record,

Lobar's Project Superintendent, Steve Miller, was deposed as part of the Underlying Action.  See Deposition of Steve Miller, 7/27/20 (Doc. 34-10) ("Miller Dep.").  Mr. Miller testified that it was his responsibility to conduct daily safety inspections in the morning before workers arrived, and that if he noticed any safety issues, he would have a Lobar employee correct the issue.  Id. at 49-50.  Regarding snow and ice removal from the Site generally, Mr. Miller testified:

> Q:    Am I correct, sir, that the removal of any and all snow and/or ice that would constitute a hazard on this project was the responsibility of Lobar?
>
> A:    Correct.

Id. at 112.  When Mr. Miller was shown a photograph of snow and ice taken on the Site on the day of Mr. Sokoloff's slip and fall, the following exchange occurred:

> Q:    What I want to know is, as far as Lobar was concerned, the ice that we see in the photograph, was it okay to allow it to be there?
>
> A:    Correct.
>
> Q:    Okay.  Explain why it was okay to be allowed to exist.
>
> A:    Because I created a clear access point through the center of the building to get into the building.
>
> . . . .
>
> Q:    Despite the fact that, in your opinion, Lobar had already provided a safe passage or walkway to enter and exit the building on February 23, 2015, and there was no reason for [Mr. Sokoloff] or anyone else to walk upon the ice as shown in [the photograph], am I

it was clearly filed some time after Lobar was served with the Underlying Complaint on March 7, 2017.  See Aff. of Serv. (Doc. 34-7).

4

> correct in still understanding that that was ice that
> nonetheless Lobar had intended to remove?
>
> A:    Yes.  At some point, we would have to remove it to
> continue work, yes.

Id. at 115.

### B.    The Contract Between Lobar and Architectural Steel

North Penn School District (the "School District") hired Lobar as the general

contractor to perform construction services at the Site.  Underlying Complaint ¶ 4; Doc.

35 ¶ 7; Doc. 37-1 ¶ 7.  Lobar and Architectural Steel then entered into a written

subcontract agreement, dated May 16, 2014, and signed on August 15, 2014, by which

Architectural Steel agreed to provide steel fabrication and steel erection services at the

Site.  See Standard Short Form Agreement between Contractor (Lobar) and

Subcontractor (Architectural Steel) (Doc. 34-8) ("Subcontract"), at 2, 3-4, 11.

The Subcontract includes obligations for Architectural Steel to keep the Site

"clean and free from debris resulting from Subcontract Work" and to "take necessary

precautions to protect the work of others."  Subcontract ¶ 6 ("Safety and Protection of the

Work of Others").  It also provides that "[d]ebris related to the work included in the

Subcontract shall be removed and disposed of . . . by Subcontractor."  Id. ¶ 15.7

("Cleaning").  The Supplementary General Conditions section of the Subcontract

provides that "[t]he Contractor [Lobar] shall be responsible for periodic cleaning up of

the . . . premises.  He shall remove all refuse of any kind regardless as to who may have

left same except shipping crates and boxes and their packing" and keep "all property

outside the immediate work areas and material storage areas clean and free from all

equipment, materials and debris." Id., Supp. Gen. Conditions ¶¶ 2G (defining "Contractor" as the "principal or prime contractor") & 14 ("Clean-Up"). The Subcontract does not explicitly reference snow and ice removal.[7]

The Subcontract also required Architectural Steel to maintain certain insurance, including commercial general liability insurance with policy limits of $1,000,000 per occurrence and $2,000,000 in the aggregate. Subcontract ¶ 3(i). The Subcontract also required Architectural Steel to "include [Lobar] as an additional insured [under such policy] for ongoing and completed operations." Subcontract ¶ 3.

### C.   The Colony Policy

Architectural Steel obtained commercial general liability insurance from Colony, covering the period from September 3, 2014, to September 3, 2015. See Policy No. 103 GL 0006077-00 (Doc. 34-9) ("Colony Policy"), at 7. The Colony Policy included liability coverage for personal injury with the required limits of $1,000,000 per occurrence and $2,000,000 aggergate. Colony Policy at 10, 11. The Colony Policy includes a Commercial General Liability Form, which states in Section 1, entitled "Coverages," as follows:

---

[7]Additionally, the parties agree that they did not enter into any other agreements as to snow and ice removal. Amended Complaint (Doc. 4) ¶ 44; Answer (Doc. 9) ¶ 44; Doc. 35 ¶ 27 & 16; Doc. 36 at 9; Doc. 37-1 ¶ 27.

**COVERAGE A[:] BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" . . . to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

. . . .

> b.  This insurance applies to "bodily injury" . . .  only if:
>> (1) The "bodily injury" . . . is caused by an "occurrence" that takes place in the "coverage territory"; [and]
>> (2) The "bodily injury" . . . occurs during the policy period. . . .

Id. at 11; see also Doc. 35-6 at 1.  The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id. Section V ¶ 13, Doc. 34-9 at 24.  The policy also includes an Endorsement, entitled "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization," which modifies insurance provided under the policy:

> **A.  Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" . . . caused, in whole or in part, by:
>
>> 1.  Your acts or omissions; or
>> 2.  The acts or omissions of those acting on your behalf;

> in the performance of your ongoing operations for the
> additional insured(s) at the location(s) designated
> above.

<u>Id.</u> at 35.[8]

### D.    **The Present Action**

On January 21, 2021, Cincinnati commenced this action seeking a declaratory judgment that Colony is obligated to defend and indemnify Cincinnati's named insured, Lobar, in connection with the Underlying Action, specifically arguing that Lobar qualifies as an additional insured under the Colony Policy.  <u>See</u> Complaint (Doc. 1). Cincinnati filed an Amended Complaint on February 25, 2021 (Doc. 4), and Colony filed its Answer on March 18, 2021 (Doc. 9).

On November 18, 2021, Colony filed a motion for summary judgment arguing that Lobar is not entitled to coverage for a defense or indemnity as an additional insured under the Colony Policy as a matter of law.  Doc. 34.  Cincinnati filed a response in opposition to the motion, and Colony filed a reply.  Docs. 36 & 38.  Meanwhile, Cincinnati filed a cross-motion for summary judgment on November 30, 2021, arguing that Architectural Steel was required to keep the Site clear of snow and ice and to name Lobar as an additional insured in the Colony Policy, and that Colony must defend and indemnify Lobar in the Underlying Action.  Doc. 35.  Colony filed a response in opposition to Cincinnati's motion.  Doc. 37.

---

[8]It is not clear whether the parties agree that Lobar was identified in the relevant schedule as an additional insured.  <u>Compare</u> Doc. 35 ¶ 33 <u>with</u> Doc. 37-1 ¶ 33.  I need not make a finding in this regard to decide the present motions.

## II.   <u>LEGAL STANDARDS</u>

### A.   <u>Summary Judgment</u>

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" if it might affect the outcome of the case under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).[9] "[A] dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u>

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute. . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." <u>Boykins v. Lucent Techs., Inc.</u>, 78 F. Supp.2d 402, 408 (E.D. Pa. 2000). The evidence presented must be viewed in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255. Because the relevant policy language is undisputed and controls the decision, I do not need to make any evidentiary inferences and will analyze the summary judgment motions together.

---

[9]<u>Anderson</u> predated the 2010 Amendment to Rule 56. However, the change in wording and location within the rule for the summary judgment standard did not alter the standard or caselaw interpretation of the standard. Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

**B.**     <u>Determining Duty to Defend Under Pennsylvania Law</u>[10]

The interpretation of an insurance policy and whether a particular claim is within

the coverage of an insurance policy are questions of law that may be decided on a

motion for summary judgment in a declaratory judgment action.  <u>See</u> <u>Fireman's Fund</u>

<u>Ins. Co. v. Empire Fire & Marine Ins. Co.</u>, 155 F. Supp.2d 429, 431 n.1 (E.D. Pa. 2001)

(citing <u>Bowers v. Feathers</u>, 671 A.2d 695, 697 (Pa. Super. 1995)).

In interpreting the relevant provisions of an insurance policy, courts are "guided

by the polestar principle that insurance policies are contracts between an insurer and a

policyholder," and thus "traditional principles of contract interpretation [apply] in

ascertaining the meaning of the terms used therein."  <u>Kurach v. Truck Ins. Exch.</u>, 235

A.3d 1106, 1116 (Pa. 2020) (citing <u>Gallagher v. GEICO Indem. Co.</u>, 201 A.3d 131, 137

(Pa. 2013)).  When interpreting a contract, the court begins with the "firmly settled"

principle that "the intent of the parties to a written contract is contained in the writing

itself."  <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 587 (3d Cir. 2009)

(quoting <u>Krizovensky v. Krizovensky</u>, 624 A.2d 638, 642 (Pa. Super. 1993)).  "'When

the words are clear and unambiguous,' the intent of the parties must be determined 'from

the express language of the agreement,'" without looking outside the contract.  <u>Id.</u>

(quoting <u>Steuart v. McChesney</u>, 444 A.2d 659, 661 (Pa. 1982)).  The court may look to

extrinsic evidence only if contract provisions are found to be ambiguous, meaning "they

---

[10]In diversity cases such as this one where the claim rests on state law, the federal
court applies the choice of law principles of the forum state.  <u>Huber v. Taylor</u>, 469 F.3d
67, 73 (3d Cir. 2006) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496
(1941)).  Here, it is undisputed that Pennsylvania courts would apply Pennsylvania law to
this action.

are subject to more than one reasonable interpretation when applied to a particular set of facts."  Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)).

In the context of a declaratory judgment action to determine an insurer's obligations, Pennsylvania follows the "four-corners rule," which provides that "an insurer's duty to defend is triggered, if at all, by the factual averments contained in [the underlying] complaint."  Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 249 (3d Cir. 2019) (quoting Kvaerner U.S., Inc. v. Comm. Union Ins. Co., 908 A.2d 888, 896 (Pa. 2006)); see also Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 673-74 (3d Cir. 2016) ("Under the four corners rule, a court in determining if there is coverage does not look outside the allegations of the underlying complaint or consider extrinsic evidence. . . .  [A]n insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint.") (citations omitted); Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 541 (Pa. 2010) ("The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint.").  Thus, if the claims against the insured made in the underlying complaint clearly lie outside the coverage provided by the policy, the insurer has no duty to defend the insured against such claims.  Moreover, because the duty to defend is broader than the duty to indemnify, if an insurer has no duty to defend, it follows that the insurer has no duty to indemnify. Sapa Extrusions, 939 F.3d at 250 (citing Kvaerner, 908 A.2d at 896 n.7; Ramara, 814 F.3d at 673).

With these principles in mind, I turn to the issue whether additional insured coverage is triggered under the Colony Policy, as determined by the language of the Colony Policy and the four corners of the Underlying Complaint.

### III.   <u>DISCUSSION</u>

#### A.   <u>Lobar Is Not an Additional Insured Under the Colony Policy</u>

Colony argues that because Mr. Sokoloff did not claim in the Underlying Action that his injuries were caused by Architectural Steel's acts or omissions, Lobar does not qualify as an additional insured and is not afforded coverage under the Colony Policy. Doc. 34-1.  Cincinnati counters that it is an additional insured under the Colony Policy and is therefore entitled to coverage.  Doc. 35 at 14.

As noted, under the language of the Colony Policy, Lobar is an additional insured with respect to injury "<u>caused, in whole or in part</u>, by . . . [Architectural Steel]'s acts or omissions[,] or [t]he acts or omissions of those acting on [Architectural Steel's] behalf." Doc. 34-9 at 35 (emphasis added).  The question raised by the parties' competing motions is whether the Underlying Complaint triggers this coverage under Pennsylvania law. Neither the parties nor the court have found state law opinions addressing declaratory judgment actions in analogous circumstances, and therefore I look to federal court opinions decided under Pennsylvania law.  The closest to this case is <u>Dale Corporation v. Cumberland Mutual Fire Insurance Company</u>, Civil Action No. 09-1115, 2010 WL 4909600, at *4, 7 (E.D. Pa. Nov. 30, 2010)).

In <u>Dale</u>, Westrum hired Dale as the manager of a construction project, and Dale in turn hired Nesmith as a subcontractor to perform construction services and provide

related materials.  2010 WL 4909600, at *1.  Under the subcontract, Nesmith was
required to add Dale as an additional insured on its general commercial liability insurance
policy with Cumberland.  The Cumberland policy, similar to the Colony Policy at issue
here, provided coverage for an additional insured "with respect to liability for [injury or
damage] caused, in whole or in part, by" the acts or omissions of Nesmith or those acting
on its behalf.  Id.  Robert Francis, who worked for an electrical subcontractor on the site,
sustained a high-voltage shock when using a lift and working close to an uninsulated
overhead power line.  Id. at *2.  Francis brought suit naming Dale and others, but not
Nesmith or its employees.  Dale filed a joinder suit seeking contribution, indemnity and
coverage from Nesmith, after which Francis filed a second suit naming Nesmith.  After
Cumberland denied the request that it defend Nesmith in the suit, Dale settled the
underlying suit and then brought a declaratory judgment action against Cumberland.

Applying Pennsylvania's four-corners rule, the court predicted that the
Pennsylvania Supreme Court would interpret the term "caused, in whole or in part" to
refer to proximate causation, rather than factual or but-for causation.  2010 WL 4909600,
at *4-7.[11]  The court then examined Francis's complaints to determine whether they

---

[11]In Ramara, the Third Circuit construed similar "caused in whole or in part"
policy language, but in the context of a policy that also contained a provision "that an
additional insured such as Ramara is entitled to excess coverage for a loss caused by its
sole negligence."  814 F.3d at 677.  The Third Circuit agreed with the district court that a
proximate cause construction could not be reconciled with the excess coverage language,
because "a loss caused by Ramara's sole negligence . . . could not be proximately caused
simultaneously by [the subcontractor]'s acts or omissions."  Id. (citing Ramara v.
Westfield Ins. Co., 69 F. Supp.3d 490, 497 (E.D. Pa. 2014)).  The Third Circuit
ultimately concluded that under either a proximate cause or but-for cause analysis,
additional coverage was triggered, in light of the allegations in the underlying suit.  Id. at

alleged any acts or omissions by Nesmith that caused his injury.  The first complaint did not mention Nesmith at all, and instead alleged the negligence of Dale and Westrum, and the court therefore concluded that the first complaint did not give rise to a duty to defend. Id. at *7.  The court also concluded that, even had the complaint identified Nesmith as the entity that rented the lift, that would not be sufficient to allege proximate causation.  Id. n.8.  Francis's second complaint, which named Nesmith only, also did not give rise to a duty to defend Dale, as Dale was not named in that suit.  Id. at *8.  Finally, Dale's third-party suit against Nesmith did not trigger a duty, because Dale was the plaintiff in that action, not a defendant.  Id.

Dale is indistinguishable in all material respects from the instant case.  Based on the four corners of the policy, Lobar is entitled to a defense if the Underlying Complaint alleges that Mr. Sokoloff's injuries were proximately caused by Architectural Steel's acts or omissions.  However, the Underlying Complaint is silent as to Architectural Steel, and does not allege any conduct at all by Architectural Steel.  To the contrary, the only claim asserted by Mr. Sokoloff in the Underlying Action is a claim of negligence against Lobar. See Underlying Complaint, Doc. 34-5 at 4 ("Count I – Negligence, Plaintiff v. Lobar, Inc.").  Therefore, Lobar is not an additional insured.  See also Continental Casualty Co. v. Westfield Ins. Co., Civ. No. 16-5299, 2017 WL 1477136 (E.D. Pa. 2017).  Even under a but-for causation analysis, there is simply nothing in the Underlying Complaint to

---

675.  Here, the parties have not pointed to a provision like the one in Ramara that would render meaningless a proximate cause construction of the Colony Policy.  Nevertheless, as will be seen, under either construction, the Underling Complaint would not trigger additional insured coverage in the present case.

identify Architectural Steel as a link in the causal chain leading to Mr. Sokoloff's accident and injuries.

Cincinnati argues that the facts in Dale are distinguishable on the ground that in Dale "there were no allegations that [Nesmith]'s actions were a cause of the Plaintiff's injuries." Doc. 36 at 4. This is an inaccurate attempt to distinguish the case. While it is correct that the underlying in complaint in Dale contained no allegations against Nesmith, it is equally true that the Underlying Complaint here contains no allegations against Architectural Steel. Cincinnati argues that "here, the argument is that Architectural Steel was responsible for and failed to maintain the worksite in a safe manner and free of hazards which was a direct cause of plaintiff's injuries." Doc. 36 at 4. The problem is that this argument is being made by Cincinnati, not Mr. Sokoloff. Looking, as I must, to the Underlying Complaint, the allegation Cincinnati posits simply does not appear.

Cincinnati's strongest factual argument to distinguish Dale is that Mr. Sokoloff's Underlying Complaint asserted negligence against "agents, servants, workers and/or employees of Lobar," which purportedly includes Architectural Steel as a Subcontractor of Lobar. Doc. 36 at 4-5. The difficulty with this argument is two-fold. First, as previously noted, the underlying complaint must assert allegations of negligence or wrongdoing against the named insured that brought about the plaintiff's injuries, and here Mr. Sokoloff alleged only that Lobar was responsible for his injuries, not Architectural Steel. Second, because an entity acts through its "agents, servants, workers, and/or employees," Cincinnati's argument is overbroad, as its construction would mean that a general contractor is an additional insured whenever any of its subcontractors was present

15

when an accident occurred, whether or not that subcontractor was identified as having

any actual potential liability.  While Pennsylvania law favors resolving doubt in favor of

the duty to defend when there is any potential liability, it does not stretch to purely

hypothetical liability.  See, e.g., Erie Ins. Ex. v. Moore, 228 A.3d 258, 265 (Pa. 2020)

("[T]he duty to defend is triggered 'if the factual allegations of the complaint on its face

encompasses an injury that is actually or potentially within the scope of the policy.'")

(quoting Babcock & Wilcox Co. v. Am. Nuclear Insurers, 131 A.3d 445, 456 (Pa. 2015)).

Cincinnati also urges the court to rely on Ramara rather than Dale.  Doc. 36 at 4-6.

Ramara involved a similar scenario, although with the additional complication of a

subcontractor who could not be sued directly by the injured worker due to Pennsylvania's

Workers Compensation Act ("WCA").  814 F.3d 660.  Ramara hired Sentry as the

general contractor to perform work at Ramara's parking garage, and Sentry hired Fortress

to install concrete and steel components as part of the job.  Id. at 664.  As required by the

subcontract, Fortress's insurance policy with Westfield provided coverage for an

additional insured "with respect to liability for [injury] caused, in whole or in part, by"

the acts or omissions of Fortress or those acting on its behalf.  Id. at 667.  One of

Fortress's employees, Anthony Axe, was injured on site and sued Ramara and Sentry, but

did not (and could not due to the WCA bar) name Fortress.  However, the complaint was

"rife" with allegations that Fortress proximately caused his accident, including that he

was employed by Fortress which was engaged by defendant Sentry, that he fell through

an opening in the garage deck while attempting to set beam clips in the normal course of

his duties, and that Ramara was negligent in failing to hire competent contractors and

16

subcontractors, perform construction services in accordance with prevailing standards of care, supervise the construction work, coordinate with contractors and subcontractors on the premises, and enforce a site-specific plan protecting against falls.  Id. at 675-76.  The Third Circuit upheld summary judgment in favor of Ramara as an additional insured on Fortress's policy with Westfield.  "Taken together and construed liberally in favor of Ramara for purposes of this insurance coverage case, these allegations partially base Ramara's liability on its failure to supervise the work of its contractors and subcontractors who used equipment improperly and disregarded a site-specific fall protection plan, all while performing their work in violation of the industry's standard of care."  Id. at 676.

In rejecting Westfield's argument that the absence of allegations directly against Fortress meant that coverage was not triggered, the court considered the public policy animating the WCA.

> The four corners rule – even under Pennsylvania's strict construction – does not permit an insurer to make its coverage decision with blinders on, disclaiming any knowledge of coverage-triggering facts.  Quite the opposite, knowledge that an injured employee has a claim under the [WCA] must be factored into a determination of whether his allegations in an underlying tort complaint potentially trigger an obligation on an insurer to provide coverage for a defendant in the underlying case.  If an insurer fails to account for the [WCA] it may construe the factual allegations of an underlying complaint too narrowly.

814 F.3d at 679.  The court emphasized that "we do not intend our opinion to be read as an expansion or modification of Pennsylvania's strict interpretation of the four corners rule."  Id.  "Rather, we hold that where the [WCA] Act is relevant to a coverage

17

determination, insurers . . . must interpret the allegations of an underlying complaint in light of the limits the Act places on the injured plaintiff." Id.  Thus, the court fashioned a rule of interpretation, specific to the WCA context, "making it more difficult for insurers to claim that the allegations of an underlying complaint fall patently outside the scope of coverage." Id. at 680.

Here, it is undisputed that Mr. Sokoloff was an employee of Miracle Steel, not Architectural Steel, at the time of his injuries, and therefore neither the concerns regarding the WCA which were raised in Ramara, nor the Third Circuit's holding in that case, is applicable.  See Continental, 2017 WL 1477136, at *10 (insured's reliance on Ramara was misplaced because that case "applies specifically to cases in which a complaint omits a party because of its immunity under the [WCA]," whereas there was no suggestion that underlying plaintiff omitted claims against landscaping company because of WCA immunity, and no allegation that underlying plaintiff was employee of landscaping company).

As noted in the procedural history, Lobar attempted to fill in the gap in Mr. Sokoloff's complaint by filing a joinder complaint naming Architectural Steel.  However, that third-party complaint does not result in a finding of additional insured status where the four corners of the original complaint filed by Mr. Sokoloff do not.  Dale, 2010 WL 4909600, at *8.  The allegations in the third-party complaint are those of Lobar, the putative additional insured, and not Mr. Sokoloff, and "[t]he duty to defend requires that the insurance carrier defend an action brought *against* the insured." Eastern, LLC v. Travelers Cas. Ins. Co. of Am.. No. 19-5283, 2020 WL 5534060, at *3 (E.D. Pa. Sept.

18

15, 2020) (emphasis in original) (citing <u>Dale</u>, 2010 WL 4909600, at *8).  Additionally, a

"third party complaint cannot be used to bolster the allegations in the original complaint"

because doing so "would violate the rule that 'the obligation of a casualty insurance

company to defend an action brought against the insured is to be determined *solely* by the

allegations of the complaint in the action.'"  <u>Dale</u>, 2010 WL 4909600, at *8 (quoting

<u>Kvaerner</u>, 908 A.2d at 896) (emphasis in original).

Cincinnati makes an additional argument as to how the Subcontract between

Lobar and Architectural Steel should be construed to require coverage.  Specifically, it

argues that because the Subcontract is silent as to snow and ice removal but requires

Architectural Steel to keep the Site clean, the Subcontract must be read to include the

responsibility to remove the hazards of snow and ice as a threat to the safety of workers

on the Site.  Doc. 35 ¶ 43 & at 16; Doc. 36 at 7-9.  Cincinnati invokes the doctrine of

necessary implication, recognized in Pennsylvania, by which "the law will imply an

agreement by the parties to a contract to do and perform those things that according to

reason and justice they should do in order to carry out the purpose for which to contract

was made. . . ."  <u>Murphy v. Duquesne Univ. of the Holy Ghost</u>, 777 A.2d 418, 434 n. 11

(Pa. 2001) (citations omitted).  Cincinnati points to language in the Subcontract requiring

Architectural Steel to keep the Site "clean and free from debris resulting from

Subcontract Work," as well as language in the general contract between Lobar and the

School District requiring all contractors to maintain the Site, and argues that this

language necessarily encompasses snow and ice removal.  Doc. 36 at 8 (citing

Subcontract ¶ 6 & Supp. Gen. Conditions ¶ 14).

Plaintiff's invocation of the doctrine of necessary implication is misplaced. Plaintiff cites to no case that allows a court to impose a duty upon a party to a contract that is not expressed in the contract, and indeed to do so would contravene the principle that "the intent of the parties to a written contract is contained in the writing itself." Am. Eagle Outfitters, 584 F.3d at 587 (applying Pennsylvania contract law) (citation omitted). Indeed, the court in Murphy referenced the doctrine of necessarily implication, not to impose a duty that had not been expressed in the contract, but rather to point out the parties' obligation of good faith to carry out their contractual duties. 777 A.2d at 433-34; see also Somers v. Somers, 613 A.2d 1211, 1214 (Pa. Super. 1992) ("A . . . requirement of good faith has been imposed under a contract doctrine developed in Pennsylvania case law called the 'doctrine of necessary implication.'") (citations omitted). A good faith duty to keep one's work area clean does not necessarily imply the duty to remove snow and ice.

Finally, in its Statement of Undisputed Facts, but not in its brief, Cincinnati avers that the Certificate of Insurance names Lobar as an additional insured. Doc. 35 ¶ 33. To the extent Plaintiff argues that the Certificate of Insurance conveyed additional insured coverage under the Colony Policy, the argument is misplaced. "Certificates of Liability Insurance do not constitute insurance contracts and do not, and cannot, confer 'additional insured' status." Motorists Mut. Ins. Co. v. Howard's Towing & Recovery, LLC, Civil Action No. 20-1406, 2021 WL 3883974, at *8 (W.D. Pa. Aug. 31, 2021) (citing Quincy Mut. Fire Ins. Co. v. Imperium Ins., 636 F. App'x 602, 606 (3d Cir. 2016) ("The

statement in the certificate of insurance that [purported additional insured] was an additional insured was without effect.").

For all of the aforementioned reasons, I conclude that Lobar is not an additional insured under the Colony Policy as a matter of law, and therefore Colony is under no obligation to defend and indemnify Lobar in connection with the Underlying Action.

### B.      Architectural Steel was Not Responsible for Snow and Ice Removal

Although Colony is entitled to summary judgment based on the language of the Colony Policy and the four corners of the Underlying Complaint, I would find for Colony even were I to find certain language in the policy to be ambiguous and look beyond it to extrinsic evidence.  That is because the language of the Subcontract did not make Architectural Steel responsible for snow and ice removal from the Site, and because deposition testimony from the Underlying Action indicates that Lobar was alone responsible for such snow and ice removal.  Therefore, were one to look beyond the Colony Policy and the Underlying Complaint, there is no basis upon which to find that Mr. Sokoloff's alleged injuries were "caused in whole or in part" by Architectural Steel's acts or omissions.

Cincinnati argues that the duty maintain the work area, implicitly including snow and ice removal, applied to all contractors at the Site.  Doc. 35 ¶¶ 26, 43.  However, as previously noted, the Subcontract between Lobar and Architectural Steel is silent as to snow and ice removal, meaning there is no provision regarding the removal of snow or ice, nor do the words "snow" and/or "ice" (or any other weather-related condition) appear anywhere in the Subcontract.  Rather, the Subcontract obligated Architectural Steel to

provide steel fabrication and steel erection services at the Site (Subcontract at 2, 11) and to keep the Site "clean and free from debris resulting from Subcontract Work" (id. ¶ 6), while obligating the principal or prime contractor (Lobar) to "remove all refuse of any kind regardless as to who may have left same except shipping crates and boxes and their packing" (id., Supp. Gen. Conditions ¶¶ 2G & 14), and to keep "all property outside the immediate work areas and material storage areas clean and free from all equipment, materials and debris" (id. ¶14).  There is no mention of "snow" and/or "ice," nor does such winter precipitation fall within the common meaning of "debris."  See Kvaerner, 908 A.2d at 897 ("Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense," for which the court may consult the dictionary definition of a word).  A current online dictionary defines "debris" as "the remains of something broken down or destroyed," "an accumulation of fragments of rocks," or "something discarded."  See merriam-webster.com/dictionary/debris (last visited Jan. 5, 2022).  This definition is consistent with observations borne from experience and common sense, as "debris" would normally be construed as the typical detritus of a construction site and not things such as snow and ice.

In sum, read in its entirety and in context, the Subcontract cannot fairly be said to contemplate that Architectural Steel would be responsible for snow and ice removal at the Site.  Additionally, it is undisputed that no other agreement exists between the parties that would obligate Architectural Steel to remove snow and ice from the Site.  See Amended Complaint (Doc. 4) ¶ 44; Answer (Doc. 9) ¶ 44; Doc. 35 ¶ 27 & 16; Doc. 36 at 9; Doc. 37-1 ¶ 27.

Deposition testimony taken in connection with the Underlying Action similarly supports summary judgment for Colony, as it makes clear that Lobar was alone responsible for snow and ice removal from the Site.  As detailed in the procedural history, Mr. Miller, Lobar's Project Superintendent, unequivocally testified that it was his responsibility to conduct daily safety inspections in the morning before workers arrived, that he would have a Lobar employee correct any safety issue he found, and that any snow and/or ice that would constitute a hazard on the Site was the responsibility of Lobar.  Miller Dep. at 49-50, 112.  Mr. Miller further testified that he had cleared a safe path for workers to enter and exit the Site on the day of Mr. Sokoloff's slip and fall, and that Lobar would have had to remove more of the snow and ice to continue work that day.  Id. at 115.

**IV.**   **CONCLUSION**

Based on the foregoing, I conclude that Lobar is not an additional insured under the Colony Policy as a matter of law, and therefore Colony is under no obligation to defend and indemnify Lobar in connection with the Underlying Action.  Because no genuine dispute exists in this regard, Colony is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a).  Accordingly, Cincinnati's summary judgment motion will be denied and Colony's summary judgment motion will be granted.  An appropriate order follows.